# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50070-1-II |
| Respondent, | |
| v. | |
| ANDREW REED MORRILL, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Andrew Reed Morrill appeals his first degree child molestation conviction. He alleges prosecutorial misconduct. He argues that the prosecutor's questions were improper because they (1) violated attorney-client privilege, (2) violated a pretrial ruling following a CrR 3.5 hearing, (3) violated a pretrial ruling to exclude prior bad acts evidence, (4) were argumentative, and (5) sought vouching testimony. Morrill also challenges the $200 filing fee imposed by the superior court. We hold that Morrill's prosecutorial misconduct claim fails but that the criminal filing fee must be stricken. We affirm the conviction, but remand to strike the filing fee.

## FACTS

### I. PROCEDURAL FACTS

The State charged Morrill by first information with first degree child rape of D.F. (count I), first degree child molestation of D.F. (count II), first degree child molestation of A.F. (count III), communication with a minor, A.F., for immoral purposes (count IV), and indecent exposure

to a victim under age 14 (count V). All charges included a special allegation of an ongoing pattern of sexual abuse. Before the first trial started, the State dismissed count V. After the first trial, the jury returned a guilty verdict on count IV and was unable to reach a verdict on counts I, II, and III. Morrill did not appeal his conviction from the first trial. However, several pretrial rulings from the first trial are relevant to this appeal.

Before the first trial, the trial court prohibited the parties from (1) referring to or describing character traits of a person "unless previously approved by the Court via offer of proof," (2) referring "to consequences of punishment from conviction," (3) referring to Morrill's prior bad acts "without prior approval of the court . . . outside the time frame in the information," and (4) "eliciting inadmissible hearsay from officers and reports or information received from third parties." Clerk's Papers (CP) at 105-06, 108-09. The trial court orally stated that the scope of the pretrial prior bad acts ruling did not cover testimony about Morrill being "discharged from his employment due to distribution of marijuana in the school" where he worked if such testimony followed an offer of proof and the approval of the court. 1 Report of Proceedings (RP) at 111.

After a child hearsay hearing, the trial court ruled that D.F.'s statements to Jefferson County Sheriff's Detective Shane Stevenson were admissible, but that A.F.'s statements to Detective Stevenson were inadmissible because he was "not younger than 10 years old" when he made those statements. CP at 47. Additionally, after a CrR 3.5 hearing, the trial court ruled that Morrill's statements to Detective Stevenson, including that Morrill's girlfriend, Margret "Maggie" Radcliffe, "cut him off from sex," were inadmissible. 1 RP at 297.

After the first trial, the State filed a third amended information including counts I, II, and III and retried Morrill on those counts. Before the second trial, the parties stipulated that the trial

court's rulings on the admissibility of the child hearsay statements of D.F. and A.F. to Stevenson before the first trial would apply during the second trial.

Before the second trial, the court prohibited the parties from (1) referring "to consequences of punishment from conviction," (2) "eliciting hearsay from officers and reports or information received from third parties," and (3) eliciting testimony from witnesses "about the reputation, credibility, or character of [Morrill] or another witness without a prior offer of proof." CP at 239, 244. The trial court denied Morrill's motion in limine to prohibit the State "from introducing evidence concerning any alleged prior uncharged crimes, wrongs, or acts." CP at 241.

The trial court dismissed count III after the State rested its case and before the judge instructed the jury. The jury found Morrill guilty of first degree child molestation of D.F. (count II) with an ongoing pattern of sexual abuse aggravator. The jury was unable to reach a verdict regarding count I, and the trial court dismissed it with prejudice. At sentencing, the superior court found that Morrill was indigent, but imposed a $200 criminal filing fee. Morrill appeals his conviction of first degree child molestation of D.F.

## II. BACKGROUND FACTS

At the time of the offenses, Morrill was 60 years old, D.F. was 6 years old, and A.F. was 10 years old. Morrill lived on the same property as D.F. and A.F. Morrill babysat D.F. and A.F. when their mother, Sabrina Wilson, and Morrill's girlfriend Radcliffe left the property.

### A. SECOND TRIAL

1. THE STATE'S CASE

At the second trial, the jury heard the following relevant testimony. Detective Stevenson interviewed six year-old D.F. The prosecutor asked Detective Stevenson to describe his training

3

in interviewing child witnesses. In response, Detective Stevenson testified, in part, that he elicits a promise from the child that he is interviewing and studies "show that if a child promises to tell the truth that they will tell the truth." 5 RP at 953. Morrill did not object to that testimony.

Detective Stevenson testified that D.F. said Morrill used a vibrator on himself in front of D.F. When D.F. "turned his head away[, Morrill] grabbed his face and turned it back" while Morrill used the vibrator on himself. 5 RP at 961. D.F. described Morrill's penis as "really tiny, and then it got bigger, and then it got huge," before "it shot sperm." 5 RP at 959. D.F. drew a picture of "[Morrill's] penis shooting sperm" during the interview. 5 RP at 958. D.F. told Detective Stevenson that "he would sleep in the tiny cabin" and Morrill would climb up to the tiny little loft in the cabin with D.F while naked. Morrill pulled D.F.'s pants down, "performed oral sex on" D.F., and "shot sperm on [D.F.]'s neck when he was doing this . . . on multiple occasions." 5 RP at 962. D.F. said that he asked Morrill if he had urinated, Morrill responded no, and D.F. asked Morrill, "Then why . . . is your penis all wet?" to which Morrill responded, "That's sperm." 5 RP at 980.

The prosecutor asked Detective Stevenson if he believe D.F. "was motivated to fabricate . . . what he told" Detective Stevenson during the interview. 5 RP at 965. Morrill objected to the question as calling for vouching, and the trial court sustained the objection.

At trial, D.F. testified that Morrill slept naked in the cabin loft with him and touched and put his mouth on D.F.'s "private part" after taking D.F.'s clothes off. 5 RP at 995. D.F. saw sperm shoot out of Morrill's penis and testified about the drawing he made of Morrill's penis shooting out sperm. The prosecutor asked D.F. if he told Detective Stevenson the truth during the interview, and he said he did. Morrill did not object to that question.

Wilson, D.F.'s mother, testified that after questioning Morrill, it "[came] to light" that Morrill molested D.F. 5 RP at 935. Radcliffe, Morrill's girlfriend at the time of the allegations, testified that Morrill sometimes slept in the cabin loft with D.F. while she slept downstairs in the cabin. Morrill "generally slept naked," but to Radcliffe's knowledge, Morrill had clothes on when he slept with D.F. 4 RP at 871, 880. Detective Stevenson testified that D.F. described the vibrator that Morrill used to masturbate and drew a picture of it.

## 2. MORRILL'S CASE

The defense called Morrill as a witness. Morrill testified that D.F. lied about Morrill putting D.F.'s penis in his mouth. Morrill denied pulling D.F.'s pants down for sexual gratification, but said he had changed D.F.'s clothes before. Morrill said he slept in the same bed with D.F. in the loft, but said he was clothed when he slept with D.F. He described one occasion on which D.F. saw him naked, saying that he woke up naked with an erection and got up to urinate. He said that Radcliffe had brought D.F. into the cabin before school while he was sleeping and that he was "disoriented" because he had just woken up when that happened. 5 RP at 1072.

The prosecutor asked Morrill, (1) "Who told you to look at the jury when you testified" about D.F. lying—"Did defense counsel tell you to do that?" (5 RP at 1091); (2) "Why is it that you would want to speak directly to the jury?" (5 RP at 1091); (3) "You haven't reviewed the discovery in this case with your attorney?" (5 RP at 1107); (4) if it was true that Radcliffe cut Morrill off from sex around the time of the allegations?; (5) if Morrill was discharged from working as a school teacher?; and (6) if Morrill "would not be able to enjoy" "the finer things in life," including "[c]lassical music," "art," "[l]iterature," and "[b]eautiful sunny days" if he was

5

convicted. 5 RP at 1096. Morrill objected to each of these questions, and the trial court sustained the objections before Morrill responded.

The prosecutor also asked Morrill if he thought "the State has an obligation to bring these kind of . . . charges when little children . . . make [the] kind of allegations" Morrill was facing. 5 RP at 1096-97. Morrill answered, "Absolutely" before the trial court sustained an objection to the question. 5 RP at 1097. Additionally, the prosecutor asked Morrill, "How do we know that you're not lying?" and Morrill did not object. 5 RP at 1096.

3.      JURY INSTRUCTIONS

The trial court instructed the jury "that the lawyers' statements are not evidence" and that the jurors "must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." CP at 116, 255. The jury found Morrill guilty of first degree child molestation of D.F. (count II) with an ongoing pattern of sexual abuse aggravator. This appeal followed.[1]

## ANALYSIS

Morrill argues that the prosecutor's conduct during the second trial was improper and prejudicial. Morrill's argument fails.

### I. LEGAL PRINCIPLES – PROSECUTORIAL MISCONDUCT

Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial. *State v. Monday*, 171 Wn.2d 667, 675-76, 257 P.3d 551 (2011). "A defendant alleging

---

[1] The notice of appeal states that Morrill seeks review of only the guilty verdict at trial of count III, first degree child molestation. However, the trial court dismissed count III. He was convicted of count II. As such, we review the conviction on count II despite the defect in the notice of appeal.

prosecutorial misconduct must prove (1) the conduct was improper and (2) he was prejudiced." *State v. Scherf*, ___ Wn.2d ___, 429 P.3d 776, 800 (2018). We examine the alleged improper conduct and prejudice "in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury." *Scherf*, 429 P.3d at 800.

Once a defendant establishes improper conduct, prejudice "is analyzed under two different standards." *Scherf*, 429 P.3d at 800. If the defendant objected to the improper conduct at trial, the defendant "'must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" *Scherf*, 429 P.3d at 800 (quoting *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). However, if the defendant failed to object to the improper conduct at trial, the defendant "must show the prosecutor's misconduct was so flagrant and ill intentioned that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the resulting prejudice 'had a substantial likelihood of affecting the jury verdict." *Scherf*, 429 P.3d at 800 (internal quotation marks omitted) (quoting *Emery*, 174 Wn.2d at 761).

## II. CONDUCT

### A. VIOLATION OF CrR 3.5 RULING

Morrill argues that the prosecutor improperly asked questions about a statement Morrill made to Detective Stevenson that the trial court ruled was inadmissible after a CrR 3.5 hearing before the first trial. We disagree.

Here, before the first trial, the trial court ruled that Morrill's *statements* to Detective Stevenson, including that Radcliffe "had cut him off from sex," were inadmissible. 1 RP at 297. The trial court did not enter a pretrial ruling on whether the prosecutor could ask Radcliffe or Morrill about *facts* related to their sexual relationship.

The prosecutor did not ask Morrill about his *statement* to Detective Stevenson. Instead, the prosecutor asked Morrill about the *fact* of whether it was true that Radcliffe cut Morrill off from sex around the time of the allegations against him. Moreover, Morrill objected, and the trial court sustained the objection before Morrill could respond. Because the prosecutor did not violate the pretrial ruling Morrill relies on, we hold that Morrill failed to show that this question was improper.

### B. Prior Bad Acts Ruling

Morrill argues that the prosecutor's questions about whether he was discharged from his employment amount to misconduct because they violated a pretrial ruling on prior bad acts. We reject Morrill's argument.

To support his argument, Morrill cites to a pretrial ruling from the first trial. Before the first trial, the judge prohibited the State from referring to Morrill's prior bad acts "without prior approval of the court . . . outside the time frame in the information." CP at 108. The trial court orally stated that the scope of the prior bad acts ruling did not include testimony about Morrill being "discharged from his employment" if such testimony was given after an offer of proof with approval of the court. 1 RP at 111. Morrill's reliance on the prior bad acts ruling from the first trial appears to be error, because only the pretrial ruling from the second trial on prior bad acts is relevant.[2]

---

[2] The State does not address the fact that Morrill's argument mistakenly relies on a ruling from the first trial.

Before the second trial, the trial court *denied* Morrill's motion to prohibit the State "from introducing evidence concerning any alleged prior uncharged crimes, wrongs, or acts." CP at 241. That ruling, and not the ruling Morrill relies on, is determinative.

Here, the prosecutor asked Morrill if he was discharged from employment as a school teacher. However, there was no pretrial ruling in the second trial forbidding such a question. Moreover, Morrill objected, and the trial court sustained the objection after an offer of proof outside the presence of the jury. Because the prosecutor did not violate the pretrial prior bad acts ruling in the second trial, we hold that Morrill failed to show that this question was improper.

### C. QUESTIONS ELICITING IMPROPER OPINION TESTIMONY

Morrill argues that the prosecutor asked improper questions that sought to elicit improper opinion testimony or improperly bolstered witness testimony. Morrill relies on *State v. Rafay*, 168 Wn. App. 734, 805-06, 285 P.3d 83 (2012), *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007), and *State v. Padilla*, 69 Wn. App. 295, 299, 846 P.2d 564 (1993), in support.

We agree with Morrill in part.

A prosecutor's questions are improper if "designed to compel a witness to express an opinion as to whether other witnesses were lying" or were truthful. *Padilla*, 69 Wn. App. at 299. Such questions are improper because they generally are designed to elicit a response from the witness about the testifying witness's opinion on the credibility of another witness. *See State v. Demery*, 144 Wn.2d 753, 758-59, 30 P.3d 1278 (2001). Therefore, it is improper for a prosecutor (1) to ask a witness whether another witness is lying or (2) to ask one witness whether another witness "had a motive to testify untruthfully." *State v. Ramos*, 164 Wn. App. 327, 335, 263 P.3d 1268 (2011).

1.     DETECTIVE STEVENSON'S TESTIMONY ON FORENSIC CHILD INTERVIEW STUDIES

Morrill challenges Detective Stevenson's testimony that studies show that if a child promises to tell the truth, that they will tell the truth, as improper opinion testimony that D.F. was truthful. We reject Morrill's argument.

First, while a prosecutor may commit misconduct by asking questions designed to elicit improper opinion testimony, the focus in determining whether prosecutorial misconduct occurred is the *question* asked and not the *response* given. *See Padilla*, 69 Wn. App. at 299. When determining whether a witness's response to a proper question consisted of improper opinion testimony, the focus is the response alone. *See Rafay*, 168 Wn. App. at 805-06; *Kirkman*, 159 Wn.2d at 928. Because these issues are distinct and Morrill challenges the testimony rather than the question, we hold that Detective Stevenson's testimony is not prosecutorial misconduct.

Moreover, the challenged portion of Detective Stevenson's testimony did not express an inappropriate opinion. "A witness's expression of personal belief about the veracity of another witness is inappropriate opinion testimony in criminal trials." *State v. Perez-Valdez*, 172 Wn.2d 808, 817, 265 P.3d 853 (2011). However, a "detective's testimony" regarding the protocol used in interviewing a child victim, "including that the child promised to tell the truth," "only provides context for the interview . . . and does not improperly comment o[n] the truthfulness of the victim." *Kirkman*, 159 Wn.2d at 934.

Here, the prosecutor asked Detective Stevenson to describe his training in interviewing child witnesses. In response, Detective Stevenson testified, in part, that he will "elicit a promise" from the child he interviews and that studies "show that if a child promises to tell the truth that they will tell the truth." 5 RP at 953. Morrill did not object to that testimony.

10

Detective Stevenson testified about forensic child interviews, not about D.F.'s credibility, in this challenged question. In *Kirkman*, our Supreme Court specifically rejected the argument that a detective's testimony on the forensic child interview protocol carried a "'special aura of reliability'" because detectives "often use a similar protocol in all child witness interviews, whether they believe the child witness or not." 159 Wn.2d at 931. While Morrill also argues that Detective Stevenson's testimony "went beyond providing information about the protocol" and "vouched for the information" that Detective Stevenson was going to testify about, we hold that the argument is meritless. Br. of Appellant at 30. Like in *Kirkman*, Detective Stevenson's comment on studies about children's promises gives context for why Detective Stevenson asked for such promises. *See* 159 Wn.2d at 934. We hold that Detective Stevenson's testimony did not amount to an improper opinion and therefore is not improper conduct.

2.      QUESTION TO DETECTIVE STEVENSON ON D.F.'S MOTIVE TO LIE

Morrill challenges the prosecutor's question to Detective Stevenson about whether the detective had any reason to believe that D.F. was motivated to fabricate the accusations against Morrill as improper opinion testimony. We agree with Morrill.

It is improper for a prosecutor to ask one witness whether another witness "had a motive to testify untruthfully." *Ramos*, 164 Wn. App. at 335. Here, the prosecutor asked Detective Stevenson if he had "any reason to believe [D.F.] was motivated to fabricate . . . what he told" Detective Stevenson during the interview. 5 RP at 965. Morrill objected to the question, and the trial court sustained the objection. We hold that the prosecutor's question to Detective Stevenson was improper. Whether Morrill suffered prejudice is analyzed below.

11

3. QUESTIONS TO D.F. ABOUT HIS TRUTHFULNESS

Morrill argues that the prosecutor improperly bolstered Detective Stevenson's testimony by asking D.F. questions about whether D.F. was truthful when Detective Stevenson interviewed him.[3] We disagree.

A prosecutor's questions are improper if "designed to compel a witness to express an opinion as to whether *other witnesses* were lying" or were truthful. *Padilla*, 69 Wn. App. at 299 (emphasis added). Here, the prosecutor asked D.F. whether he was truthful, and it was not designed to elicit a response from D.F. on the credibility of another witness. Based on *Padilla*, the question was not improper.

## D. ATTORNEY-CLIENT PRIVILEGE

Morrill argues that the prosecutor's questions to Morrill about the content of privileged communications amount to misconduct. The State acknowledges that the prosecutor's questions were improper but argues that the questions did not prejudice Morrill.

Here, the prosecutor asked Morrill the following challenged questions:

> Q Who told you to look at the jury when you testified. Did defense counsel tell you to do that?
> . . . .
> Q Why is it that you would want to speak directly to the jury?
> . . . .
> Q You haven't reviewed the discovery in this case with your attorney?

5 RP at 1091, 1107. Morrill objected to each of these questions, and the trial court sustained the objections before Morrill responded.

---

[3] Morrill did not object to those questions.

We agree with the State. Even assuming without deciding that these questions are improper, there is insufficient prejudice to warrant reversal as discussed below.

### E. ARGUMENTATIVE QUESTIONS

Morrill argues that the prosecutor asked "argumentative questions" that he contends did not aid the jury in the fact-finding process or in determining his guilt or innocence. Br. of Appellant at 27 (quoting RP at 1096-97). For support he cites to *Crippen v. Pulliam*, 61 Wn.2d 725, 380 P.2d 475 (1963), and *Rae v. Nelson*, 152 Wash. 10, 277 P. 75 (1929).

A question is argumentative if it presents the State's "theory of the case." *State v. Ruiz*, 176 Wn. App. 623, 643-44, 309 P.3d 700 (2013). Further, "'[c]ounsel is not permitted to impart to the jury his or her own personal knowledge about an issue in the case under the guise of either direct or cross examination when such information is not otherwise admitted as evidence.'" *Ruiz*, 176 Wn. App. at 641 (quoting *State v. Denton*, 58 Wn. App. 251, 257, 792 P.2d 537 (1990)). Argumentative questions are subject to restriction under ER 403. *Ruiz*, 176 Wn. App. at 644.

While cross-examining Morrill, the prosecutor asked Morrill if he would "be able to enjoy" "the finer things in life," including "[c]lassical music," "art," "[l]iterature," and "[b]eautiful sunny days" if he was convicted. 5 RP at 1096. Morrill objected, and the trial court sustained the objection before Morrill could respond.

The question did not present the State's theory of the case that D.F. truthfully testified that Morrill sexually assaulted him and that D.F.'s statements to Stevenson were consistent with his testimony. The question also did not impart the prosecutor's own personal knowledge to the jury. *See Ruiz*, 176 Wn. App. at 641. Instead, the question probed a possible motive for Morrill to lie,

i.e., to avoid prison so he could continue to enjoy the "finer things in life." 5 RP at 1096. We hold that Morrill has failed to show that this question was improper.

Morrill challenges two more questions as "argumentative." Br. of Appellant at 28. The prosecutor tasked Morrill with how "do we know that you're not lying." 5 RP at 1096. Morrill did not object to that question.

The prosecutor also asked Morrill if he thought "the State has an obligation to bring these kind of . . . charges when little children . . . make [the] kind of allegations" Morrill was facing. 5 RP at 1096-97. Morrill objected, and the trial court sustained the objection. However, before the objection, Morrill answered, "Absolutely." 5 RP at 1097.

These questions did not present the State's theory of the case, that D.F. truthfully testified that Morrill sexually assaulted him and that D.F.'s statements to Stevenson were consistent with his testimony. These questions also did not impart the prosecutor's own personal knowledge to the jury. *See Ruiz*, 176 Wn. App. at 641. Morrill fails to show that these questions were improper. Thus his arguments fail.

### III. PREJUDICE AND CUMULATIVE EFFECT OF ERRORS

#### A. PREJUDICE

Morrill argues that he was prejudiced when the prosecutor improperly asked Morrill whether Morrill's attorney told Morrill "'to look at the jury when [he] testified.'" Br. of Appellant at 17. He contends that the question was prejudicial because it left the jury with an impression that he and his attorney were trying to manipulate the jury into finding him credible. Morrill also argues the remarks were intended to belittle Morrill and his counsel and to insinuate that neither were to be trusted by the jury.

Further Morrill argues that he was prejudiced when the prosecutor improperly asked Detective Stevenson if he had "reason to believe" D.F. "was motivated to fabricate" what he told Detective Stevenson during the interview. Br. of Appellant at 29. Morrill contends that the question was prejudicial because Detective Stevenson's "testimony often carries 'a special aura of reliability.'" Br. of Appellant at 30 (quoting *Kirkman*, 159 Wn.2d at 928).

Once a defendant establishes improper conduct, we analyze whether the improper conduct prejudiced the defendant. *See Scherf*, 429 P.3d at 800. If the defendant objected to the improper conduct at trial, the defendant "'must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" *Scherf*, 429 P.3d at 800 (quoting *Emery*, 174 Wn.2d at 760).

Here, the following questions to Detective Stevenson and Morrill were improper: (1) whether Detective Stevenson had "any reason to believe [D.F.] was motivated to fabricate . . . what he told" Detective Stevenson during the interview and (2) whether Morrill's attorney told him "to look at the jury when [he] testified." 5 RP at 965, 1091. Morrill objected to each of the improper questions, and the trial court sustained the objections. In addition, the prosecutor's questions regarding who told Morrill to look at the jury and to testify directly to the jury, and whether he had reviewed discovery with his attorney are assumed improper. However, Morrill fails to show that these errors "'resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" *Scherf*, 429 P.3d at 800 (quoting *Emery*, 174 Wn.2d at 760).

"The most effective types of corroboration" in child sexual abuse cases, "of course, are eyewitness testimony, a confession or admissions by the accused, and medical or scientific testimony documenting abuse." *State v. Swan*, 114 Wn.2d 613, 622-23, 790 P.2d 610 (1990).

However, physical evidence is rarely available in child sexual abuse cases because sex offenses against children generally "involve nonviolent conduct," *State v. Thorgerson*, 172 Wn.2d 438, 442 n.1, 258 P.3d 43 (2011), "such as petting, exhibitionism, fondling and oral copulation. *Swan*, 114 Wn.2d at 623; *State v. Young*, 160 Wn.2d 799, 817 n.13, 161 P.3d 967 (2007).

As such, "a child victim's precocious knowledge of sexual activity" is "indirect evidence of abuse" that corroborates the child victim's statements accusing a defendant of child sexual abuse. *Swan*, 114 Wn.2d at 623. For example, a "child's description of ejaculation" or "fellatio" may be sufficient to corroborate their account of sexual abuse. *Swan*, 114 Wn.2d at 633. Additionally, where a child consistently describes alleged sexual abuse over time, "the possibility that [the child is] speaking from faulty recollection [is] remote." *Swan*, 114 Wn.2d at 651.

Here, there was direct and indirect evidence that Morrill molested D.F. The State had to prove that Morrill had "sexual contact" with D.F. RCW 9A.44.083. The jury instructions defined "[s]exual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party." CP at 265. D.F. testified that Morrill slept naked in the cabin loft with him and touched and put his mouth on D.F.'s "private part" after taking D.F.'s clothes off. 5 RP at 993. D.F. said he saw sperm shoot out of Morrill's penis and testified about the drawing that he made of Morrill's penis shooting out sperm during the forensic child interview with Detective Stevenson. We hold that D.F.'s testimony is direct evidence that Morrill molested him. We also hold that D.F.'s precocious sexual knowledge, specifically his knowledge of ejaculation and sperm as a six-year-old, is indirect evidence corroborating his accusations against Morrill. *Swan*, 114 Wn.2d at 623.

There was also testimony from other witnesses corroborating D.F.'s account of Morrill's conduct. Detective Stevenson testified that D.F. made the following consistent statements about the abuse during the forensic child interview. D.F. told Detective Stevenson that "he would sleep in the tiny cabin" and that Morrill had climbed up to the tiny little loft in the cabin with D.F. while naked. 5 RP at 961. D.F. told Detective Stevenson that Morrill "pulled [D.F.]'s pants down," "performed oral sex" on D.F., and "shot sperm" on D.F.'s "neck when he was doing this . . . on multiple occasions." 5 RP at 962.

D.F. described Morrill's penis as "really tiny, and then it got bigger, and then it got huge" before "it shot sperm." 5 RP at 959. D.F. said that he asked Morrill if he had urinated, Morrill responded no, and D.F. asked Morrill, "'Then why . . . is your penis all wet?'" to which Morrill responded, "'That's sperm.'" 5 RP at 980. D.F. said Morrill used a vibrator on himself in front of D.F. When D.F. "turned his head away[, Morrill] grabbed his face and turned it back" while Morrill used the vibrator on himself. 5 RP at 961. The fact that D.F.'s statements to Detective Stevenson were consistent with his testimony at trial reduce the possibility that D.F.'s recollection of the alleged abuse was false. *Swan*, 114 Wn.2d at 651.

Additionally, Wilson testified that after questioning Morrill, it "[came] to light" that Morrill molested D.F. 5 RP at 935. Radcliffe testified that Morrill sometimes slept in the cabin loft with D.F. while she slept downstairs in the cabin and that Morrill "generally slept naked," but to Radcliffe's knowledge, Morrill had clothes on when he slept with D.F. 4 RP at 871. This testimony corroborates D.F.'s testimony that Morrill slept with D.F. and shows that Morrill had an opportunity to commit the alleged offense. Detective Stevenson testified that D.F. described

the vibrator that Morrill used to masturbate and drew a picture of it. This testimony partially corroborates D.F.'s account of Morrill using the vibrator to masturbate in D.F.'s presence.

In response to this evidence, Morrill testified that D.F. lied about Morrill putting D.F.'s penis in his mouth. Morrill also denied pulling D.F.'s pants down for sexual gratification, but said that he had changed D.F.'s clothes before. Morrill further testified that he slept in the same bed with D.F. in the loft, but said he was clothed when he slept with D.F. He described one occasion on which D.F. saw him naked, saying that he woke up naked with an erection and got up to urinate. Aside from accusing D.F. of lying, Morrill's testimony corroborates D.F.'s testimony that Morrill slept with D.F. and that D.F. saw Morrill naked with an erection on at least one occasion.

Given the direct and indirect evidence of child molestation there is not "'a substantial likelihood'" that the minimal improper conduct affected the verdict. *Scherf*, 429 P.3d at 800 (quoting *Emery*, 174 Wn.2d at 760). Therefore, we hold that the improper questions did not prejudice Morrill.

## B. CUMULATIVE ERROR

Morrill argues that the cumulative effect of the alleged errors unfairly prejudiced him and violated his right to a fair trial. The State responds that to the extent any errors occurred, any error was harmless when viewed in the context of the entire record. We reject Morrill's argument.

Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant his right to a fair trial, even if each error standing alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "'[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'"

*State v. Lindsay*, 180 Wn.2d 423, 443, 326 P.3d 125 (2014) (alteration in original) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d 673 (2012)). But cumulative error does not apply where the errors are few and have little or no effect on the outcome of the trial. *Weber*, 159 Wn.2d at 279. Additionally, "the doctrine does not apply where the defendant fails to establish how claimed instances of prosecutorial misconduct affected the outcome of the trial or how combined claimed instances affected the outcome of the trial." *Thorgerson*, 172 Wn.2d at 454.

Here, there were only few instances of improper conduct, and the trial court sustained objections to the two improper questions. Because there were few errors and Morrill failed to show that the errors affected the outcome of the trial, we hold that Morrill's cumulative error argument fails.

We hold that some of the prosecutor's conduct was improper, but that given the strength of the State's evidence and in light of the jury instructions, the prosecutor's limited instances of improper conduct did not prejudice Morrill's right to a fair trial.

IV. LEGAL FINANCIAL OBLIGATIONS

Morrill challenges the superior court's imposition of a $200 criminal filing fee that was a mandatory cost at the time of sentencing. The State concedes that the filing fee should be stricken.

The legislature recently amended RCW 36.18.020(2)(h) to prohibit the superior courts from imposing the $200 filing fee on indigent defendants. LAWS OF 2018, ch. 269, § 17. These statutory amendments apply prospectively to cases pending on appeal. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). Here, the superior court found Morrill indigent. Thus,

No. 50070-1-II

under *Ramirez*, we remand to the superior court to amend Morrill's judgment and sentence by striking the criminal filing fee.

We affirm but remand to strike the filing fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, C.J.

LEE, J.